STATE OF MARYLAND USE OF MARY COUGHLAN *vs.* BALTIMORE & OHIO RAIL ROAD COMPANY, AND BALTIMORE & OHIO RAIL ROAD COMPANY *vs.* STATE OF MARYLAND USE OF MARY COUGHLAN.

RAIL ROAD COMPANIES, LIABILITIES OF : 1 CODE, ART. 65, SECS. 1 AND 2 : EVIDENCE : PLAINTIFF MUST NOT HAVE CONTRIBUTED TO THE INJURY BY HIS OWN NEGLIGENCE : PRAYERS AND INSTRUCTIONS TO THE JURY : MEASURE OF DAMAGES : PARENT AND CHILD.

The Baltimore & Ohio Rail Road Company were the owners of a track on Locust Point, Baltimore, and used a locomotive for moving and arranging trains thereon. On the occasion in question, a train consisting of many cars was being backed by a locomotive at a slow speed around a curve, near which were houses which prevented the engineman from seeing the rear-most car upon which two boys had climbed and were riding, holding by the bumper, with their feet upon the brake-bar. A sudden jolt threw them upon the road, when the cars passed over them, killing one and maiming the other. The mother of the child thus killed, brought an action for damages against the Rail Road Company under Article 65, Sections 1 and 2 of the Code. It was in evidence that both boys had been driven from similar trains on former occasions, and complaint made to their parents. It was admitted that there was no employee of the company on the rear end of the hindmost car, or walking in advance of it, while moving backwards, and that the engineman and conductor knew nothing of the accident until some time after it had happened, HELD :

1st. That the liability of the defendants in this case did not depend upon their obligations as carriers of passengers, in which character they are bound "to use the utmost care and diligence which human foresight can use," but their liability, if any, arises upon a statute which limits the action to such wrongful act, neglect or default, "as would (if death had not occurred) have entitled the party injured to maintain an action and recover damages in respect thereof."

2nd. That the party injured not being a passenger, the defendants were not required to exercise that degree of vigilance which the law requires toward those with whom there is a relation of trust and confidence, or bailment between the parties.

3rd. That if there was neglect or default on the part of the boy, or the absence of that prudence which boys of like age and capacity usually exhibit, the defendants were not liable, although by the exercise of extraordinary care on their part the accident might have been prevented.

4th. That in actions for injuries resulting in death, the plaintiff must show that neither the party injured, nor the parties for whose use the action

State use of Coughlan *vs.* Baltimore & Ohio R. R. Co.

was brought, had contributed by neglect or want of care to the calamity complained of.

5th. That where an omission in an instruction given enures to the advantage of the appellant, advantage cannot be taken of the same on his appeal.

6th. That the law entitles the mother to the services of her child during his minority only, (the father being dead,) beyond this, the chances of survivorship, his ability or willingness to support her, and the mental suffering of the mother, resulting from the death of her child, are matters too vague to enter into an estimate of damages merely compensatory.

CROSS APPEALS from the Superior Court of Baltimore City.

The action in this case was brought in the name of the State to the use of Mary Coughlan against the Baltimore and Ohio Rail Road Company, to the September Term, 1861, of the Superior Court of Baltimore City, to recover damages for the killing of her child, Peter Bannon.

The declaration alleges that the said Peter was wounded and injured on the 13th of October, 1860, by the wrongful act, neglect or default of the said Company's agents while engaged by the authority and direction of the said Company in the management and use of their railway, &c., in such a manner that he afterwards, on the same day, of the said wounds and injuries, died.

The bill of particulars filed in the case state, that about four and a half o'clock, P. M., on the 13th of October, 1860, while a train of cars belonging to the said Company were upon the railway at Locust Point, they were suddenly, without any brakesman or other person having previously gone back to see that the track was clear, and without sufficient warning or intimation to the people residing in the neighborhood of and along said railway, put in motion and backed around a short curve, by which means, Peter Bannon, a child, about ten and a half years old, the son of Mary Coughlan, the party for whose

use this suit was brought, was run over and killed, the wheels of the cars of said train passing over and horribly crushing and mangling his head, so that he died of the wounds so received on the said 13th of October, 1860 ; and that there was negligence on the part of those having the management of said train of cars from which negligence the said death resulted, and that the damages claimed are $10,000. The defendants pleaded "Not Guilty."

*Exception.*—The plaintiff to maintain the issue on its part joined, proved by *Newcomer*, a police officer of Baltimore city, that his beat was at Locust Point, in said city, on the 13th October, in the year 1860 ; that he knew the plaintiff's *cestui que use* and her children, the eldest of whom was named Peter, a likely lad, small, of twelve years of age apparently, and who attended to his mother's business when she was absent ; that Mrs. Coughlan lived at the corner of Towson and Marriott streets, where she kept a grocery ; that there was what is called a Y in the rail road track where the road comes along Nicholson street, and at or near Towson street it follows a semi-circle until it reaches Marriott street, up which it passes close by Mrs. Coughlan's house and store ; that Marriott street is not paved or used as a carriage road, and the rail road passes through a cut between Towson street and Haubert street ; that the next street to Towson street is Cooksie street ; that there are houses on Towson street, and a number of them within the Y, which would prevent an engineman at the corner of Nicholson and Towson streets from seeing the end of the train if it extended past Mrs. Coughlan's up Marriott street ; that the witness knew that the defendants' cars were often left standing across Towson street, and that he had notified the agents that it was improper, and that they must remove them ; that there was a school house, and beyond that a spring, to reach which, from Mrs. Coughlan's, and the other houses within the Y, it

was necessary to cross Marriott street ; that hearing that an accident had happened on the 13th of October aforesaid, he went to the spot, which was near the intersection of Cooksie and Marriott streets, and saw where a person had been run over by the cars, and dragged apparently some thirty or forty yards.   He afterwards saw the body, which was Mrs. Coughlan's eldest son, Peter, the brother of whom had been injured at the same time.

The plaintiff further proved by *Mrs. Jennings*, a competent witness, that Peter, the boy that was killed, was a slight made boy, small and cunning like, and apparently between ten and twelve years of age, who rendered to his mother the services of a boy of his age, taking care of the store when she went away.

*George Wright*, proved that after the accident he helped to cut loose and shove the cars back, so as to extricate the body, and that it was fifteen or twenty minutes before any of the hands of the defendants came to the place.

*Slothower*, a competent witness, produced on the part of the plaintiff, proved as follows : He was on his way from the brick yards, and saw Mrs. Coughlan's boys playing on the track—he heard the cars. The cars first moved slowly, and then faster. One got on the car, and one boy was getting on it. The train was being backed, and the boys were in front of the last car, and about twenty yards from witness ; they were hanging on behind the cars when one fell.   Witness began to cry out to the engineer—one boy was hanging on to the cars at the time.   There was no agent or employee on the back of the train, or near it, that witness saw, when the accident happened.

Several other witnesses were offered by the plaintiff, who proved the character of the boy, and the circumstances of the extrication of the body, none of whom, however, saw the

accident; and the plaintiff further offered evidence to show that the services of such a lad as the deceased to his mother were worth from $5.00 to $6.00 per month, and that the place where the accident occurred was the most populous portion of that part of the city.

The defendants, to support the issue on their part, offered evidence by *Henry Linn*, a competent witness, that he saw the accident as he was crossing the common from his work; that the children were playing on the common above the rail road track when the end of the train which was being backed came round the curve; that three or four minutes before the cars stopped, he saw the children run towards them, and the eldest, the deceased, get on the hindmost one when the train was still in motion, catching the bumper with his hands, and putting his feet on the brake-rod below; that he then saw the big boy (Peter) fall off, with his head across the track, and he was killed. On cross-examination, this witness stated as follows: He was with two companions at the time, and when he saw the cars, he proposed to them to take a ride on them, but they objected and they did not go—witness had often done the same thing before. When witness proposed to get on the train, he was near enough for Mrs. Coughlan's sons to have heard what he said, but he cannot swear that they heard him or did not hear him. At the time of the accident, witness saw no agent or employee of the defendants at the end of the train, or near it, or in the neighborhood of it.

The defendants further proved by —— *Sticker*, teamster of the defendants at Locust Point, that he knew the deceased, and had often driven him and other children from the cars, and warned them of the danger they ran of being killed or crippled, and told the mother of Peter of the conduct of her children, when she said she had tried to keep them off, but could not; and the defendants proved a like notice

to the children of Mrs. Coughlan and others, at various times, by —— *Kelso*, the watchman at Locust Point, in the service of the defendants, by *Jacob Parker*, the brakes-man on the train that caused the accident, and by *Ennes Toby*, the conductor of the train ; also by —— *Shier*, one of the defendants' employees.

The defendants further proved by *Robert McManus*, that he was the engineer of the engine No. 60 that was backing this particular train at the time of the accident ; that it was a regulating engine, whose business was to collect to-gether the cars from the adjacent wharves and tracks, and unite them into a train to be taken off by another engine ; that on this occasion he had collected forty-four or forty-six cars, and had backed them until they lapped round the Y, and that he had still four or six cars to add to make up the desired number ; that he had backed the train from time to time, and when he added the last cars, he backed it again at a very slow speed, for it was as much as the en-gine could do to move it, the grade on Marriott street, up which it extended, being up hill ; that he blew his whistle three times before he began to back it, which is the rail road signal to its employees for backing, and he was confi-dent he so blew it on this occasion ; that he could not see the end of the train from where he stood on his engine ; and that he was not aware of the accident, and did not be-come aware of it for half an hour afterwards.

On the cross-examination of *Jacob Parker*, above named, he said that it was his business to attend to the cutting loose and attaching of the train as it was being made up, and applying the brakes ; that he was so engaged on this occasion not far from the engine ; that he knew the whistle was blown, having been led by circumstances to recollect it on the evening of the day of the accident, but that he did not know that the accident had happened until half

an hour afterwards ; that he did not go to the rear of the train before it was moved backwards, and that it was not his practice to do so. In their examination in chief, both *McManus* and *Parker* testified to the fact that the train was moving very slowly at the time.

On cross-examination of *Ennes Toby*, the conductor, he stated that he did not go to the rear of the train ; that he could not see it from where he was at the time of the accident ; that his business was to attend to making up the train and to give notice to the engineman how far to back his engine; that there was no one on the rear car or at the rear of the train at the time ; that had he been at the corner of Towson and Marriott streets he could have seen the end of the train and the engineman too ; that sometimes he did go there to look out ; that on this occasion the train was moving so slowly, the engine having as much as she could do to push the train at all up the grade of Marriott street, that any one who had seen it coming might have got out of the way ; that in his judgment he was at the time using the greatest care, but that since he has used somewhat more care.

This witness, on his examination in chief, in speaking of the notice to the children and the mother, said that the mother had whipped her children for getting on the cars ; that he had seen the children on the cars when in motion, and driven them off. It was proved by the production of the family record that the age of the deceased was ten years, eight months and three days.

The plaintiff thereupon prayed the Court to instruct the jury as follows :

1st. That if, from the evidence, the jury believe that the Baltimore and Ohio Rail Road Company are the owners of a rail road track or tracks, and of certain cars and engines used thereon, at Locust Point, in the city of Baltimore, along which track, or tracks said cars and

State use of Coughlan *vs.* Baltimore & Ohio R. R. Co.

engines were drawn or propelled for the purposes and in and about the business of said rail road company, then in the movement, use and management of said cars and engines, the said company is bound to exercise the utmost care and diligence to prevent accidents endangering the life or lives of the people or inhabitants of said city.

2nd. That if the jury shall believe from the evidence that the said rail road company were at the time of the accident complained of, the owners of a rail road track or tracks, and of certain cars and engines used thereon, at Locust Point, along which track or tracks said cars and engines were drawn or propelled for the purposes of said company, then, for the purpose of preventing accidents endangering human life, the said company were bound to use all the means and measures of precaution that the highest prudence would suggest, and which it was in their power to employ, and that if the use of a guard or lookout at the head or in the rear of said cars when the said company was engaged in making up its train or trains, if the jury shall find they were so engaged, was a measure by which such accidents would probably be avoided, the omission to use such guards or lookouts at the head and rear of said cars or trains, if proved to the jury, was culpable negligence; and it is for the jury to say whether to this negligence the fatal accident, (if the jury shall find such fatal accident,) which has given rise to this action might not justly be imputed.

3rd. That if the jury believe from the evidence that the plaintiff is entitled to recover upon the ground set forth in the second prayer above, they will, in their estimate of damages, take into consideration the expense to which the plaintiff was subjected in consequence of the accident and the loss resulting therefrom, not only to the present time, but also the probable prospective loss and expense incurred by the plaintiff in consequence of said accident, and that

in estimating the said loss and damages the jury are not limited to the actual pecuniary loss proved in the case.

And the defendants prayed the Court to instruct the jury as follows :

1st. The defendants, by their counsel, prayed the Court to instruct the jury that if they find from the evidence that the child of the plaintiff, *cestui que use,* spoken of by the witnesses, was run over and killed by the cars of the defendants, and that the place where the accident took place, although marked as a street on the plat of the city, if the jury shall find that fact, was not opened or used as such, and was not a thoroughfare used by the public or persons residing in the neighborhood, but was occupied by the track of the defendants' road only, and that the said child was not at the time of the accident using it as a thoroughfare or crossing the same, and that at the time of the accident the said cars were moving at a speed which would have permitted either an adult or a child to have avoided them, even had such person been using the said street as a thoroughfare, or crossing the same, if he had used such diligence as was reasonably to have been expected from him, then the plaintiff is not entitled to recover.

2nd. The defendants, by their counsel, prayed the Court to instruct the jury that if they shall find from the evidence that the child of the plaintiff, *cestui que use,* spoken of by the witnesses, was run over and killed by the cars of the defendants, and that the said child was of sufficient intelligence to take charge of and attend to the business of said *cestui que use* in her absence from her store, and that he did so take charge of and attend to it, and that just before the happening of the accident he was playing outside of the road of the defendants where the accident happened, and in a place of safety, so far as the defendants' cars were concerned, and that seeing the said cars in motion he ran toward them and jumped upon the leading car, as de-

scribed by the witness Linn, and was riding there when he was jolted off or fell off, and was killed as described by the witnesses, then the plaintiff is not entitled to recover, even though the jury shall believe that the defendants did not use the care and diligence that would have prevented the child from getting upon the cars as aforesaid.

3rd. The defendants, by their counsel, prayed the Court to instruct the jury that if they shall find from the evidence that the child of the plaintiff, *cestui que use*, spoken of by the witnesses was run over and killed by the cars of the defendants, and that the said child just before the happening of the accident was playing in a place of safety, so far as said cars were concerned, and that seeing the said cars in motion he ran towards them and jumped upon them, as described by the witness Linn, and was riding there when he was jolted off or fell off, and was killed as described by the witnesses, and that the said child had been warned previously not to get upon the said cars as he might be crippled or killed, and had been driven from off them on previous occasions, and that he was of an age to understand such warning and the risk he run, then the plaintiff is not entitled to recover, even though the jury shall believe that the defendants did not use the care and diligence that would have prevented the said child from getting upon the cars aforesaid.

4th. The defendants, by their counsel, &c., prayed the Court to instruct the jury that even if the jury shall find from the evidence that at the time of the happening of the accident spoken of by the witnesses, the defendants were not complying with the regulations of the ordinance offered in evidence by the plaintiff in regard to the use of locomotive engines within the limits of the city of Baltimore, yet the plaintiff is not on that account entitled to recover. If the jury shall believe from the evidence that the conduct of the child of the plaintiff, *cestui que use* was

the immediate cause of the accident, and that his death was the result of a want on his part of that degree of care which the jury may believe was under all the circumstances naturally and reasonably to be expected in one of the said child's age and intelligence.

5th. The defendants, by their counsel, prayed the Court to instruct the jury that in assessing damages they are confined to those for which a pecuniary estimate can be made, independent of the mental pain and suffering of the *cestui que use*, and that they are to take into consideration the probabilities of life, as well as other circumstances. Which instructions of both plaintiff and defendants the Court (MARTIN, J.) rejected, but instructed the jury as follows:

I instruct the jury—

1st. That if the jury find from the evidence that the Baltimore and Ohio Rail Road Company are the owners of the rail road track or tracks, and of certain cars and engines used thereon, at Locust Point, in the city of Baltimore, along which track or tracks said cars and engines were drawn or propelled, for the purposes and about the business of the said rail road company, then in the movement, use and management of said cars and engines, the said company is bound to exercise the utmost care and diligence which it was within their means and power to employ to prevent accidents endangering the life or lives of the people and inhabitants of said city ; and if the jury find that the child of the plaintiff's *cestui que use* was run over and killed by the defendants' cars, as described by the witnesses, and that if the defendants, in the use and management of their cars and engines had exercised the highest degree of care and diligence, which it was within their means and power to employ, the said accident could have been prevented, then the plaintiff is entitled to recover in this action ; but although the jury may find that the said

State use of Coughlan *vs.* Baltimore & Ohio R. R. Co.

accident could have been prevented by the use of such care and diligence on the part of the defendants, yet the plaintiff is not entitled to recover if the jury believe the accident could have been avoided by the exercise of that degree of care by the said child, which was, under all the circumstances, to be naturally and reasonably expected from one of the said boy's age and intelligence.

2nd. That if the jury find, under the first instruction, a verdict for the plaintiff, that in assessing the damages they are not to take into consideration the mental pain and suffering of the plaintiff's *cestui que use* in consequence of the death of the child, and are not to give against the defendants punitive, vindictive or exemplary damages, but in estimating the damages they are confined to the pecuniary damage sustained by the plaintiff, and are to give to her such a sum as the jury may believe, from all the evidence in the case, will be an adequate compensation for the loss of her son's services from the time of his death to the period when, if he had lived, he would have attained the age of twenty-one years.

To the action of the Court in rejecting their prayers and granting the instructions given as aforesaid, the plaintiff and defendants excepted and brought up these appeals.

*A. S. Ridgely* and *Robert J. Brent* for the appellant.

I. The first instruction of the Court below precludes a recovery "if the jury believe the accident could have been avoided by the exercise of that degree of care by the child, which was under all the circumstances to be naturally and reasonably expected from one of the said child's age and intelligence." The rule that non-suits the surviving relative, if the deceased's own negligence contributed to the injury, is admitted. *Redfield on Railways*, 337. *Tucker vs. Chaplin*, 2 Car. & K., 730.

This action is founded on statute. 1 Code, Art. 65, secs. 1 and 2.

State use of Coughlan *vs*. Baltimore & Ohio R. R. Co.

The Code is in terms similar to the English Act known as Lord Denman's Act. *Redfield on Railways*, 336, 337. *Pierce on Railways*, 257.

By this a remedy is provided for certain relatives of the deceased, only in cases where, if the injury had not proved fatal, he would himself have had a right of action against the party inflicting the injury. *Pierce on Railways*, 262. 1 Md. Code, sec. 1, p. 449.

It is a cardinal rule of interpretation that statutes are to be construed in reference to the principles of the common law, for it is not presumed that the Legislature intended to make any innovation upon the common law further than the case absolutely required. The law rather infers that the Act was not designed to make any alteration other than what is specified, or besides what has been plainly pronounced. *Dwarris on St.*, 675. *Keech vs. B. & O. R. R. Co.*, 17 *Md. Rep.*, 45.

At common law a plaintiff cannot recover for injuries to which his own fault or negligence directly contributed. *Redfield on Railways*, 337. 2 *Car. & R.*, 730. 17 *Md. Rep.*, 45. *B. & O. R. R. Co. vs. Lamborn*, 12 *Md. Rep.*, 261. *Lygo vs. Newbold*, 9 *Ex.*, 303, 306. *Irving vs. Sprigg*, 6 *Gill*, 200. *Edwards vs. Balt. F. Ins. Co.*, 3 *Gill*, 176. And this negligence is understood to be a want of ordinary care, such as men of common prudence use under like circumstances. *Pierce on Railways*, 272, 274. *Lygo vs. Newbold*, 9 *Ex.*, 306.

But this interpretation of the negligence here spoken of is received with qualification in cases of children and disabled persons. In such cases it has been considered that the want of ordinary care required of the plaintiff is only such as his capacity admits of, or such as may reasonably be expected of him. *Pierce on Railways*, 278. *Redfield on Railways*, 330. *Lynch vs. Nurdin*, 1 *Q. B.*, 29, (41 E. C. L.,) 422. *Lygo vs. Newbold*, 2 *Ex.*, 302. *Robinson*

*vs. Cone,* 22 *Ver.,* 213. *Borge vs. Gardner,* 19 *Conn.,* 507. *Beers vs. Housatonic R. R.,* 19 *Conn.,* 566.

Instead, therefore, of instructing the jury that the plaintiff could not recover "if the jury believed the accident could have been avoided by the exercise of that degree of care by the said child, which was, under all the circumstances, to be naturally and reasonably expected from one of his age and intelligence," the Court should have told the jury that the plaintiff was not entitled to recover if the jury believed that on the occasion alluded to "there was a want of that degree of care on the part of said child, which, under the circumstances, was naturally and reasonably to be expected in one of his age and intelligence." The question of a want of or absence of such care should have been left to the jury, rather than the question of the exercise of such care. The instruction as given was calculated to mislead the jury. It was further calculated to mislead them, because it enabled them, in their caprice, to suppose that a very high degree of care was required on the part of the deceased. The question of negligence, the want of ordinary care, and not the degree of care to be exercised, should have been left to the jury.

II. The second instruction was designed to guide the jury in their assessment of damages, and we maintain that it was erroneous :

1st. Because it ignores the mental sufferings of the mother suing for the damages sustained by the loss of the child, and confines her claim to pecuniary damages. Whatever may be the English rule on this subject, we insist that according to the best considered cases in America, the mental anguish, which is the natural result of the injury, may be taken into account in estimating damages, though not of itself the fountain head of the action. *Redfield on Railways,* 337, *note* 3, 338, *and cases there cited. Canning vs. Williamstown,* 1 *Cush.,* 451. *Morse vs.*

7     v. 24.

*Aub. & Syr. Railway*, 10 *Barb.*, 623. *Dickens vs. N. Y. Cen. R. R.*, 28 *Barbour*, 41, 43; and see the New York statutes in connection with this case. *Penn. R. R. Co. vs. McCloskey*, 23 *Pa. Rep.*, 528.

2nd. Because it limits the pecuniary loss of the mother, the *cestui que use*, to the minority of the child, and therefore deprives, the jury of the right to award her damages for the pecuniary loss she would reasonably sustain in her advanced life for want of the labor and services of the deceased son, even after he reached his majority. The rule should have been to allow " what they considered a reasonable compensation." *Redfield on Railways*, 337, *note*, 2*nd Ed. Ainsworth vs. South E. R. R.*, 11 *Jurist*, 758. *V. & J. R. R. Co. vs. Patton*, 31 *Miss.*, (2 *Geo.*,) 156. *Kountz vs. Brown*, 16 *B. Monroe*, (*Ken.*,) 577. *Penn. R. R. Co. vs. Kelly*, 7 *Casey*, (31 *Penn.*,) 376. *Penn. R. R. Co. vs. Zebe*, 9 *Casey*, (33 *Penn.*,) 330. *Blake vs. M. R. R. Co.*, 10 *Eng. L. & E. Rep.*, 442.

We are not aware of any authorities which limit the mother's loss to the minority of her son. Such a principle would give no damages to an aged mother, whose only support was in the labor of an adult son, who is taken from her by the culpable negligence of a corporation.

Even the inexorable conscription Acts of Congress, under the exigent demands of war, spare such a son to his widowed mother; and unless there be some controlling adjudication, we submit that the ruling of the Court below was too narrow and limited to meet the approval of this tribunal.

*John H. B. Latrobe*, for the Baltimore and Ohio Rail Road Company, argued that the prayers offered on the part of the defendants below, and refused by the Court, should have been granted:

1st. As to the first prayer of the defendants:—because the rules applicable to the streets of a city are not appli-

cable to a common, where streets exist but in a plat of the ground.

2nd. As to the second prayer of the defendants:—because the standard of intelligence suggested by the prayer, and asked to be given to the jury, was a proper standard.

3rd. As to the third prayer of the defendants :—because the facts stated in the prayer were proper to be considered by the jury, and sufficient to guide them. That the want of intelligence on the part of the child was supplied by actual warning.

4th. As to the fourth prayer of the defendants :—because the defendants were entitled to the benefit of the law there stated, and which, even though they were in fault, relieved the defendants, if the child, having sufficient intelligence, was a contributor to its own wrong.

5th. As to the fifth prayer of the defendants :—because the true rule of damages in like cases is that there laid down.

And they contend that the instructions of the Court were erroneous for want of those qualifications in favor of the defendants, to which they were entitled.

In support of these propositions, the following authorities were cited : *Ainsworth vs. Eastern R. R. Co.*, 11 *Jurist,* 758. *Gilbard vs. Lancashire R. R. Co. Chitty on Carriers,* 413. *Blake vs. R. R. Co.*, 83 *Eng. C. L. Rep.*, 93. *New York vs. Ransom,* 23 *How.*, 487.

BOWIE, C. J., delivered the opinion of this Court.

These are cross appeals, in an action instituted under the 1st and 2nd Sections of Article 65, of the Code, by the State, for the use of a widowed mother, whose son was killed, under the circumstances detailed in the bill of exceptions.

After evidence offered by both parties, a series of prayers was submitted by each, all of which were rejected and others

given by the Court instead thereof, to which rejection, and the instructions given, the plaintiff and defendants severally excepted.

The counsel of the defendants, having filed in these causes a declaration in writing, that in the event of an affirmance of the judgment as against the plaintiff on its appeal, in the first case, the defendants will abandon their exceptions, it is proper first to inquire whether the appellant has been aggrieved by the action of the Court below.

The General Assembly of this State, in the year 1852, finding the common law maxim, " Personal actions die with the person," unsuited to the circumstances and condition of the people, enacted a law entitled " An Act to compensate the families of persons killed by the wrongful act, neglect, or default of another person." To make its design more obvious, the fourth section provides " the word person shall apply to bodies politic and corporate," and " all corporations shall be responsible under this act, for the wrongful acts, neglect or default of all agents employed by them."

The material provisions of this Act, as well as its title, are derived from the 9th and 10th Victoria, and are embodied in Art. 65, (title Negligence) of the Code.

The object of the several series of prayers was, 1st, to furnish the jury with a standard of care and diligence, required by law, of the defendants, to exempt them from liability for damages, for the injury incurred ; 2nd, to prescribe the care necessary to be exercised by the deceased, to entitle his next of kin to recover ; 3rd, to define the measure of damages .

The appellant's first prayer required the defendants, under the circumstances therein predicated, " to exercise *the utmost care and diligence* to prevent accidents endanger-

ing the life or lives of the people or inhabitants of the said city.''

The second held that the defendants were bound to use all the means and measures of precaution that the highest prudence would suggest, and which it was in their power to employ, and if the use of a guard or lookout at the head or in the rear of said cars * * was a measure by which such accidents would probably be avoided, the omission was culpable negligence.

The appellant's third prayer affirms, that the jury in the estimate of damages should take into consideration, the expense to which the plaintiff was subjected in consequence of the accident, and the loss resulting therefrom not only to the present time, but also the probable prospective loss and expense, etc., and that in estimating the said loss and damage, the jury are not limited to the actual pecuniary loss proved in said case.

The propositions laid down by the Court, in the first instruction granted, are,

That the defendants in the movement and management of their cars and engines were bound to exercise the utmost care and diligence which it was within their means and power to employ to prevent accidents and injuring or endangering the life or lives of the people. And if the jury find that the child of the plaintiff's *cestui que use,* was run over and killed by the defendants' cars as described by the witnesses ; ''and that if the defendant's in the use and management of their cars and engines, had exercised the *highest degree of care and diligence,* ' which it was wthin their means and power to employ,' the said accident could have been prevented, then the plaintiff is entitled to recover in this action ; but although the jury may find that the said accident could have been prevented by the use of such care and diligence, on the part of the defendants, yet the

plaintiff is not entitled to recover if the jury believe the accident could have been avoided by the exercise of that degree of care by the said child which was under all the circumstances to be naturally and reasonably expected from one of said boy's age and intelligence.''

The degree of care and diligence, imposed by law on the defendants, in the instruction given by the Court, is as high as that required by the appellant's prayers ; the degree is, the '' utmost care and diligence,'' the '' highest it was within their means and power to employ ;'' the only material difference is, that one of the appellant's prayers asked the Court to instruct the jury specifically '' that if the use of a guard or lookout, at the head or in the rear of said cars, was a measure by which such accidents would probably be avoided, the omission was culpable negligence.'' The general terms, used by the Court, embraced all the particulars specified by the prayer of the appellant, qualified by the words, ''it was within their means and power to employ.'' The jury were at liberty to find under the instruction given, and perhaps did find that the absence of the guard constituted the want of ''the highest care and diligence within the means and power of the defendants,'' and therefore rendered their verdict in favor of the plaintiff.

The liability of the defendants in this case, did not depend upon their obligations as carriers of passengers, in which character they are bound to use '' the utmost care and diligence which human foresight can use.'' *Stockton vs. Frey,* 4 *G.,* 422, 423. *Worthington vs. Balto. & Ohio R. R.,* 21 *Md. Rep.,* 275. But their liability, if any, arises upon a statute which limits the action to such wrongful act, neglect or default, '' as would (if death had not ensued) have entitled the party injured to maintain an action and receive damages in respect thereof.'' Vide Code, Art. 65, Sec. 1.

The party injured not being a passenger, the defendants were not required to exercise that degree of vigilance,

which the law requires towards those to whom there is a relation of trust and confidence or bailment between the parties. " Towards the one the liability of the latter springs from a contract express or implied, and upheld by an adequate consideration. Towards the other, he is under no obligation but that of justice and humanity. While engaged in their lawful business, both are bound to use a degree of caution suited to the exigencies of the case." 8 *Barbour*, 378.

In an analagous case, this Court said, rail road companies should use " such care and diligence in using the locomotive upon the road, as would be exercised by skillful, prudent and discreet persons having the control and management of the engine, regarding their duty to the company, the demands of the public and the interests of those having property, and having a proper desire to avoid injuring property along the road." This was said in a case of injury to property, but is cited with approbation by Redfield as applicable to persons. *Redfield on Railways*, 395. 4 *Md. Rep.*, 257.

The Court's instruction did not close with the definition of the degree of care and diligence on the part of defendants, but proceeded to inform the jury that although the accident could have been prevented by the exercise of such care and diligence by the defendants, yet the plaintiff is not entitled to recover, if the jury believe the accident could have been avoided by the exercise of such care by the child as might under all the circumstances have been reasonably expected from one of his age and intelligence. In other words, if there was neglect or default on the part of the boy, or the absence of that prudence which boys of like age and capacity usually exhibit, the defendants were not liable, although by the exercise of extraordinary care on their part the accident might have been prevented.

This ruling is in conformity with all the text writers,

and the great majority of adjudged cases. *Redfield on Railways*, 337. 2 *C. & P.*, 730. 8 *C. B.*, 115.

It is objected on the part of the plaintiff below, the appellant in this case, that the Court's first instruction was erroneous, in instructing the jury the action could not be maintained, "if the jury believe the accident could have been avoided by the *exercise of that degree of care by the said child* which was, under all the circumstances to be naturally and reasonably expected from one of his age and intelligence;" whereas the Court should have told the jury, the plaintiff could not recover, if the jury found "there was a want of that degree of care on the part of the said child which under the circumstances, was naturally and reasonably to be expected in one of his age and intelligence." The question of the "*want of*," or "*absence of*" such care, should have been left to the jury rather than the exercise of such care. It is difficult, if not impossible, to perceive the difference between the two propositions. In the Court's instructions, the proposition is stated affirmatively; in the appellant's objection, it is negatively. The jury was to find whether there was or was not due care on the part of the deceased. They are told by the Court, if they believe the accident could have been avoided by "the *exercise* of that degree of care," etc., the plaintiff cannot recover. The appellant insists that it is not the exercise, but the want of care, (which is the non exercise of care,) that is the criterion. The principle of the common law, that a plaintiff cannot recover for injuries "to which his own negligence directly contributed," is admitted, and it seems to us, it was clearly expressed by the Court in the instruction given, as far as the conduct of the deceased child was concerned.

In the case of the *B. & O. R. R. Co. vs. Lamborn*, 12 *Md. Rep.*, 261, and *Keech's case*, 17 *Md. Rep.*, 46, the rule of the common law that the plaintiff could not recover for injuries to which his own negligence directly contributed, was held to

apply to actions brought on the statutes therein referred to, and the instructions affirmed by the Court in these cases submitted to the jury, the question of negligence on the part of the plaintiff, as well as on the part of the defendants.

The same policy would require the plaintiff to show in actions for injuries resulting in death, that neither the party injured nor the parties for whose use the action was brought, had contributed by neglect or want of care to the calamity complained of. This omission in the instruction given enured to the advantage of the appellant and cannot be taken advantage of on her appeal.

The objection raised by the plaintiff to the Court's second instruction, involves the measure of damages. In the language of the briefs, " it was erroneous, 1st. Because it ignores the mental sufferings of the mother suing for damages sustained by the loss of the child, and confines her claim to pecuniary damages. 2nd. Because it limits the pecuniary loss of the mother, the ' *cestui que use* ' to the minority of the child, and deprives the jury of the right to award her damages for the pecuniary loss she would reasonably sustain in her advanced life for want of the labor and services of the son, even after he reached his majority. The rule should have been to allow what they considered a reasonable compensation."

In the absence of any interpretation of this act by our own Courts, we must compare and weigh the reasoning of the authorities cited, in which similar acts have been construed by other tribunals. First in order are the decisions in England upon the Act called Ld. Denman's Act, 1 *Redfield*, 336. The observations of COLERIDGE, J., in the case of *Blake, administrator, vs. the Midland Railway*, 10 *Eng. L. & E. Rep.*, 467, cited by Redfield in his notes, are very strong in support of the instructions given by the Court below in this case, confining the jury to the pecuniary damage sustained by the plaintiff. He says, " our only safe course is

to look at the language the legislature has employed.  *  *
The title of the Act is for compensating families of per-
sons, etc., not for solacing their wounded feelings."  *  *
By the terms of the Act quoting the second section, "the
measure of damages is not the loss or suffering of the
deceased, but the injury resulting from his death, to his
family." This language seems more appropriate to a loss
of which some estimate may be made, than an "indefinite
sum, independent of all pecuniary estimates, to soothe the
feelings, and the decision of the amount strongly tends
to the same conclusion." As we have before intimated,
the title and language of the Act of Assembly of this State
are almost literally the same with those of English statutes.
The former contains also the provision for distributing
the damages among the surviving members of deceased's
family, on which the learned Judge relies, for adopting the
principle of *compensation* for damages which may be esti-
mated in money.

The American cases, arising upon Acts varying in lan-
guage, necessarily lead, as observed by Judge REDFIELD, to
a diversity of decisions. We have no better guide than
the construction of a statute originating in the same
policy, and expressed in the same words, by enlightened
jurists, distinguished for their independence and jealous
regard for the rights of suitors.

It is assumed by the learned author just mentioned, as
the conclusion of the best considered cases in this country,
"that mental anguish which is the natural result of the
injury, may be taken into the estimate of the damages to
the party injured, although not of itself the foundation of
the action." The connection, in which this assumption
is made, might lead to the inference, that it applied
to actions brought by *survivors*, for injuries done to
their deceased ancestor, relative or next of kin; but
upon reference to the authorities cited, it will be found,

"" that the plaintiffs in those cases were the persons sustaining the bodily harm, and in estimating their damages," their mental suffering constituted an element of compensation." 1 *Cush. Rep.*, 451, and 10 *Barb.*, 623.

To have instructed the jury to allow "what they considered a reasonable compensation," would, in the language of the Supreme Court of Pennsylvania, " be giving the jury discretionary power without stint or limit, highly dangerous to the rights of the defendant, and leaving them without any rule whatever." *Rose vs. Story*, 1 *Barr Rep.*, 190, 197.

In the case of *The Penn. Rail Road vs. Kelly*, 7 *Casey*, 372, the same learned Court say: "Generally speaking (they add,) the influence of the Court in this class of cases, should be exerted to restrain those excesses into which juries are apt to run.    *    *    *    Wild verdicts are frequently rendered.    And the tendency in modern times undoubtedly is to excessive damages, especially where they are to be assessed against corporations." *Ibid*, 379.   33 *Penn. Rep.*, 330.   *The Penn. R. R. Co. vs. Zebe et ux.*   The last objection to the second instruction granted is, that it limits the mother to compensation for the loss of her son during his minority only.

To submit to a jury the value of a life without limit as to years, would have been to leave them to speculate upon its duration, without any basis of calculation.   The law entitles the mother to the services of her child during his minority only ; (the father being dead,) beyond this, the chances of survivorship, his ability or willingness to support her, are matters of conjecture too vague to enter into an estimate of damages merely compensatory.

According to the appellant's theory, the mother and son are supposed to live on together to an indefinite age ; the one craving sympathy and support, the other rendering reverence, obedience and protection.   Such pictures of filial

piety are inestimable moral examples, beautiful to contemplate, but the law has no standard by which to measure their loss.

This Court being of opinion that the several instructions granted by the Court below, were as favorable to the plaintiff (the appellant) as she was entitled to, and that she was not prejudiced by the rejection of the prayers submitted on her part, finds no error in the rulings of the Court below, in the first appeal, and will affirm the judgment.

*Judgment affirmed.*

(Decided February 28, 1866.)